Filed 2/17/22  In re J.N. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re J.N., et al., a Person Coming Under the Juvenile Court Law. | B311650 (Los Angeles County Super. Ct. No. DK02402C, DK02402D, 17CCJP01112A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. Jose N., et al., Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Steff Padilla, Judge Pro Tempore.  Affirmed.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant.

Law Office of Karen B. Staler and Karen B. Staler, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Peter Ferrera, Principal Deputy County Counsel for Plaintiff and Respondent.

—————————————

S.S. (Mother) and Jose N. (Father) appeal from the juvenile court's denial of their respective petitions under Welfare and Institutions Code section 388[1] seeking to have their children J.N. (8 years old), N.F. S.-N. (7 years old), and Jo.N. (4 years old) returned to their custody. The juvenile court concluded that the parents had demonstrated a substantial change of circumstances, but it was not in the best interests of the children to return them to the parents' home from their placement in the home of paternal grandmother D. S. N.-R. (Grandmother). Despite the parents' progress in resolving a cycle of domestic violence and substance abuse, we cannot conclude that the juvenile court abused its discretion. Therefore, we affirm.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

# FACTUAL AND PROCEDURAL HISTORY

## Parents' Family History

Grandmother had three children with her first husband, including Father, before divorcing in 1991. The Department reported that there were substantiated allegations against Grandmother based on general neglect of her three children. She periodically left the children in her mother's care and had used drugs for 17 years, including heroin and cocaine.

In 2003, when Father was 16 years old, he began a relationship with a woman seven years older than him. They had three children together and married in 2007. He enlisted in the military and completed his first term with an honorable discharge. In 2009, after his first deployment, he began having problems with alcohol. He reenlisted in the military, but after an incident of domestic violence, he received a "bad conduct discharge." After a lengthy separation, Father eventually divorced his first wife.

Mother is a registered member of the Chickasaw Nation. She has two children from prior relationships, Grace S. (born November 2004) and Brayden J. (born May 2008). Although Grace and Brayden were declared dependents, they are not subjects of this appeal.

In April 2013, Mother and Father had J.N., the oldest of the three subject children.[2] A few months later in July 2013,

---

[2] As will be apparent, three additional children were born after the current dependency case began: N.F. (born January 2015) and Jo.N. (born May 2017), who are subjects of this appeal,

3

Father was arrested and convicted for driving under the influence of alcohol (DUI). Brayden's father Steven J., who lives in Oklahoma, sought custody of Brayden, which the Chickasaw Nation Court granted in early November 2013. Steven J. agreed to wait until the school's winter break to take custody.

## Initiation of Current Case Based on Inappropriate Discipline

On November 21, 2013, when J.N. was six months old, the Los Angeles County Department of Children and Family Services (the Department) filed a petition under section 300, subdivisions (a), (b) and (j), on behalf of Grace, Brayden, and J.N. Brayden's teacher had reported bruises on his face and his statement that Father hit him with a belt. The petition alleged that Father inappropriately disciplined Grace by striking her with a belt, which Mother knew about and failed to protect Grace from, and Mother inappropriately disciplined Brayden by spanking him with a shoe. The court ordered Mother and Father not to use corporal punishment and ordered the Department to provide family maintenance services. The children remained in the family home. Mother and Father enrolled in a parenting program.

On January 16, 2014, the Department filed a petition under section 385 seeking detention of the children based on Father's arrest for slapping Brayden and Father's violation of a safety plan that Mother signed which prevented Father from returning to the family home. The court detained J.N. from

---

and Jos.N. (born January 2020), who is not a subject of the appeal.

Father and ordered Father not to return to the family home. All three children remained in Mother's custody.

At the combined jurisdiction and disposition hearing on March 27, 2014, the court sustained amended petition allegations based on inappropriate discipline. Because the Chickasaw Nation had granted custody to Steven J., the court dismissed the case as to Brayden. Grace and J.N. remained in Mother's custody, but the court removed J.N. from Father's custody. Father had monitored visitation with J.N. twice a week, but was to have no contact with Grace until further order of the court. The court ordered parenting classes, anger management, and counseling for Father and counseling services and parenting classes for Mother.

**May 2014 to September 2015 - J.N. out of the Family Home for 16 Months**

A few months later in May 2014, after learning Father was at the house every day in violation of the court's visitation and no contact orders, the Department filed a section 387 supplemental petition seeking removal of Grace and J.N., who was then just over one year old. The court detained Grace and J.N. from Mother's custody, and ordered family reunification services. The court ordered monitored visitation for Mother with both children and separate monitored visitation for Father with J.N. three times per week. The no contact order between Father and Grace remained in effect. The court ordered the Department to assess Grandmother for placement.

On July 16, 2014, the court sustained the section 387 petition and ordered the children suitably placed. The court

5

granted a petition by the Chickasaw Nation to intervene. The court ordered the Department to provide family reunification services, including individual and domestic violence counseling for Mother, and individual counseling, domestic abuse, and anger management for Father. For the first time, the court ordered Father to participate in random or on demand drug testing. If any test was missed or positive, he would be required to complete a substance abuse program. Mother was to have monitored visitation with both children three times per week, separate from Father's monitored visitation with J.N. three times per week.

Between August 2014 and December 2014, Father had five negative drug tests and six nonappearances for random drug tests, some of which he missed due to work assignments. By early January 2015, Father had begun his domestic violence treatment program, was in the middle of his anger management treatment program, and was in the late phase of his child abuse treatment program with positive growth and participation. The court gave the Department discretion to liberalize visitation and allow Mother and Father to visit together.

N.F., who is the second of the children subject to this appeal, was born on January 29, 2015, and remained in Mother and Father's care.

At a six-month review hearing in February 2015, the court found Mother and Father were in partial compliance with the case plan and continued reunification services. In March 2015, Mother and Father began having overnight visits on weekends. In August 2015, the court provided the Department with discretion to release the children pending the next hearing.

Mother made tremendous efforts to travel by bus to court-ordered services and visits, but missed several domestic violence

6

group sessions.  In the opinion of the domestic violence counselor, Mother was in denial and she minimized, justified, and rationalized Father's verbal, and possibly physical, abuse.  The domestic violence counselor recommended Mother continue with therapy to have a place to learn to advocate for herself and her children.

Father's time was divided among his joint custody of his older children from his prior relationship, his job, and his program participation.  He completed a 52-session child abuse treatment program, a 12-session anger management program, and 32 individual therapy sessions including components of domestic violence.

Service providers expressed concern about Mother and Father's relationship, specifically Father's commitment to the relationship and his issues of power and control.  In the assessment of the couples' therapist, they had difficulty with communication and challenges with power dynamics.

Between February 2015 and August 2015, Father had seven negative drug tests and did not appear for three tests.  On August 27 and September 2, 2015, he tested positive for alcohol. A social worker explained that because of the positive test, he must complete a substance abuse program.  Father said he did not realize that he was not allowed to drink alcohol, but he would comply in order to get his kids back.  He enrolled in a drug and alcohol program.

In the assessment of the Department, the parents remained cooperative and committed to their case plan, with the goal to reunify with the children.  Mother and Father struggled with life issues, including finances and housing, but continued to work on the programs ordered by the court.

On September 24, 2015, the juvenile court ordered Grace released to Mother and J.N. released to both parents. The record does not reflect any consideration of the logistical challenge created by releasing J.N. to both parents while a no contact order existed between Grace and Father. The court ordered family maintenance services and all programs continue. In addition, Father was ordered to attend two Alcoholics Anonymous meetings each week, continue drug testing, and not miss any tests.

## October 2015 to August 2016 – J.N. Back in the Family Home for 11 Months

The parents struggled to comply with court-ordered services, and Father continued to struggle with alcohol abuse. From October 2015 to February 2016, Father had six negative drug tests and did not appear for five tests. The juvenile court allowed Father to have random or on demand tests. In April 2016, Father was arrested for DUI. Between April and June 2016, Father had one negative test and missed three tests.

Two and a half years after the initial petition was filed in November 2013, there was evidence of ongoing domestic violence and father's alcohol use, even though both parents had been participating in services. In May 2016, Grace informed her teacher that Father ripped Mother's shirt off, flattened her car tires, lifted up J.N. and threw him at Grace, and kicked Mother, Grace, and J.N. out of the family home. The most serious incident occurred on June 13, 2016. Mother and Father argued about ending their relationship. Father pulled Mother's hair, grabbed her by the neck, and punched her in the ribs. Father

8

also attempted to sexually assault her during the incident. 16-month-old N.F. and 3-year-old J.N. were in the room during the assault. 8-year-old Grace returned to the room when she heard arguing and scuffling. She saw Father straddling Mother on the bed, holding her down by her arms. Mother was crying and Father appeared to be hurting her. Both adults yelled at her to leave the room. Mother reported the domestic violence to the police officers who visited the home, and she reported the attempted rape to the police the following day. In addition, she stated there had been domestic violence every other day for the four years of their relationship. Mother sought emergency shelter.

On June 30, 2016, originally scheduled for a family maintenance review hearing, the Department filed a section 300 petition for N.F. and a section 342 subsequent petition for J.N. based on the June 13, 2016 domestic violence incident. The court ordered N.F. and J.N. detained from Father, but left all of the children in Mother's custody. Father's visits were to be monitored.

Between June 2016 and August 2016, Father failed to appear for four random drug tests. On August 5, 2016, Father drove his truck into a tree while intoxicated, fled the scene to avoid arrest, and reported the truck stolen.

**September 2016 to June 2017 – J.N. and N.F. out of the Family Home for 9 Months**

In September 2016, during an unannounced visit, a social worker found Father hiding in the back seat of Mother's car. On September 22, 2016, the court ordered Grace, J.N., and N.F.

9

detained from both parents based on Mother allowing Father to frequent the home and have access to the children in violation of court orders. The court ordered separate, monitored visitation for Mother and Father with their respective children.

In October 2016, after Father arrived intoxicated and crying at a monitored visit with the children and played roughly with J.N., the Department filed an amended petition for Grace and J.N. adding an allegation about Father's history of unresolved alcohol abuse and DUI arrests. The Department later added the same allegation to N.F.'s pending section 300 petition. The Department concluded that Mother and Father were together as a couple. Father failed to show up for eight drug tests between September 2016 and January 2017, and tested positive for alcohol on January 5, 2017.

On January 12, 2017, the juvenile court sustained the amended petitions for Grace, J.N., and N.F., and entered a removal order. The court ordered family reunification services and monitored visitation. Father was ordered to complete a drug and alcohol program, weekly drug tests, a 12-step program with a sponsor, a 52-week domestic violence program, developmentally appropriate parenting classes, and joint counseling with Mother. Mother was ordered to participate in a domestic violence support group, developmentally appropriate parenting classes, and individual counseling.

In January 2017, Father stopped drinking alcohol and enrolled in a substance abuse program, which he completed. Between January 18 and May 23, 2017, Father had nine negative drug tests and did not miss any tests.

In April 2017, Mother's and Father's visits with their respective children were liberalized to unmonitored.

10

On May 23, 2017, Mother and Father had another son together, Jo.N., who is the third child subject to this appeal. Mother told the Department that she understood no contact was permitted between Father and Grace, which meant Father could not be present when Mother visited with Grace, J.N., and N.F.

By June 2017, the parents were in substantial compliance with their treatment plan. At the combined six-month review hearing for N.F. and 18-month review hearing for Grace and J.N. on June 20, 2017, the juvenile court placed Grace in Mother's custody, and J.N. and N.F. in Mother's and Father's custody, with family maintenance services. Father was still to have no contact with Grace.

## June to October 2017 – J.N. and N.F. Back in the Family Home for 4 Months

On June 25, 2017, a social worker conducted an unannounced visit to Mother's residence and observed the home to be cluttered and unkempt. Garbage was strewn throughout the garage.

Father had two negative drug tests in June 2017, but did not appear for two drug tests in July 2017.

In August 2017, the property manager for Mother's home noticed 12-year-old Grace driving Mother's car through the housing complex while Mother supervised. The property manager told Mother that Grace was unlicensed and not allowed to drive in the complex. On August 26, 2017, Mother allowed Grace to drive in the housing complex while she supervised, with younger siblings J.N., N.F., and Jo.N. in the car. Grace crashed into the family garage, and Father ran out of the house to see

what happened. Unaware that video surveillance recorded the incident, Mother told the property manager that she had accidentally driven into the garage. Mother also told a social worker that after taking the children to school, Mother returned and hit the garage.

In August and September 2017, Father had four negative drug tests.

## October 2017 to April 2018 – Detention of the Children (J.N.'s Third, N.F.'s Second, and Jo.N.'s First Detention)

In October 2017, the Department filed a section 342 subsequent petition for Grace, J.N., and N.F., based on Mother allowing Grace to drive her car and allowing Father to have unlimited contact with Grace in violation of the juvenile court's orders. The Department also filed a section 300 petition on behalf of four-month-old Jo.N. containing the same allegations brought previously concerning the older children. The juvenile court detained all four children from parental custody.

On October 25, 2017, the Department instituted a referral for weekly drug testing for Father. Father disputed that he was required to test weekly; he believed that he was required to call in daily and follow the scheduling prompts for random testing, not weekly testing. The Department instructed Father to contact his attorney for further clarification. He had two negative tests and did not appear for four tests, some of which were excused by the Department based on the scheduling confusion and Father's documentation that he had appeared.

The parents informed the Department that they were married and living together as a married couple. Their goal was

12

to regain custody of the children and raise the children together as a family.

At the end of November 2017, the Department reported that more than 18 months of reunification services had been provided for Grace and J.N., and the parents had continued to present dishonestly throughout the life of the case. Father admitted being in the home to help Mother with watching the children. Grace stated that she wanted to live with one of her grandmothers, and she was not afraid of Father. The Department asserted that the family failed to address the issues which brought them to the attention of the Department. Although father had tested negative for drugs and alcohol multiple times and provided the Department with the name of his sponsor, the Department did not consider him to be committed to sobriety because he only attended one Alcoholics Anonymous meeting per week and did not do "step work." He continued to drive without a valid driver's license, and his behavior created a hostile environment for the foster parent, who agreed to keep all four children as long as she did not have to monitor visits with the parents.

In the view of the Department, the parents' lack of compliance with court-ordered services, failure to honor the no-contact order by allowing Father access to Grace, Father's unresolved substance abuse, and allowing Grace to drive the car, resulting in a crash with the younger children in the car, placed the children at risk for future abuse and harm. The Department, with the support of the Chickasaw Nation, recommended that the court order permanent placement services and no reunification services for Grace, J.N., or N.F. The Department recommended six months of reunification services for Jo.N.

13

On February 23, 2018, the attorney representing the children filed a statement of issues and contentions. The children's attorney noted that Mother and Father received 51 months of services, of which 28 months were formal family reunification for Grace and J.N., and 8 months were family reunification services for N.F. The parents continued to engage in the same behavior patterns that led to detention of the children, showing no evidence that they had internalized any of the knowledge they should have gained. The children's right to safety and permanence was now the priority. The children's attorney recommended no further services as to any of the children.

In March 2018, the juvenile court struck the allegations about Grace driving Mother's car from the section 342 and section 300 petitions, and as amended, sustained the petitions. At the disposition hearing, the juvenile court ordered family reunification services as to all four children and lifted the order prohibiting contact between Father and Grace. The court ordered expedited Interstate Compact on the Placement of Children (ICPC) requests for Steven J., the maternal grandmother, and Grandmother.

Father enrolled in another substance abuse treatment program in March 2018, which he completed in August 2018. He found this program to be the most effective, because the participants were committed to sobriety. He found a sponsor through this program who he talks to several times each week.

On April 9, 2018, the children's attorney filed an application for rehearing on the ground that the law prohibited the juvenile court from granting additional reunification services. The attorney noted that three out-of-state relatives were

14

awaiting approval for placement of the children, and it was unfair to delay when the children had been living in unstable placements since 2013.

## May 2018 to February 2019 – Termination of Reunification Services and Mother's First Section 388 Petition

Upon rehearing on May 16, 2018, the juvenile court found there were no services available to prevent further detention as to any of the four children, and the court denied family reunification services for Jo.N. under section 361.5, subdivision (b)(10). The court gave the Department discretion to liberalize the parents' visitation with their respective children. The court scheduled a section 366.26 permanency planning hearing for September 2018, and a permanency planning review hearing for November 2018.

The juvenile court continued the section 366.26 hearing on multiple occasions to accommodate the Department. The Department incorrectly reported Father had been arrested in April 2018 for DUI for refusing to test and had failed to notify the Department of the DUI arrest. Father had in fact been stopped for having a head lamp out and was arrested on an outstanding warrant for a prior violation.

In December 2018, Mother filed a section 388 petition seeking to return J.N., N.F., and Jo.N. to her care or to reinstate family reunification services. Mother argued that the children were not in permanent plans yet. Mother and Father had complied with their case plans, making efforts that went beyond the court's requests. She provided documentation of parenting classes and therapy sessions that she had completed.

15

On January 7, 2019, the juvenile court denied Mother's section 388 petition. The juvenile court found there was a substantial change in circumstances, because no further incidents of inappropriate discipline or domestic violence had occurred, but it was not in the best interest of the children, after five years and three removals, to continue to grant further reunification services. The court allowed Mother and Father to have monitored visits together with the children.

At the Department's request, the juvenile court continued the section 366.26 permanency planning hearing to May 6, 2019.

**April 2019 to March 2020 - Father Files Section 388 Petition after Placement with Grandmother**

In April 2019, the ICPC for Grandmother for J.N., N.F., and Jo.N. was approved. With approval from the Chickasaw Nation, the juvenile court placed Grace in the home of Steven J. in Oklahoma and placed J.N., N.F., and Jo.N. with Grandmother in Arizona. The court changed the date for the section 366.26 permanency planning hearing to May 21, 2019.

On April 29, 2019, Father filed a section 388 petition seeking return of J.N., N.F., and Jo.N. to his custody or for the court to reinstate family reunification services. On May 21, 2019, at the request of the Department, the juvenile court continued the hearing on the section 388 petition and the 366.26 hearing to June 21, 2019, so the Department could respond in writing to Father's section 388 petition.

In its June 2019 response, the Department acknowledged that after further investigation, Father had not been arrested for DUI in April 2018. In the next section of the report, however, the

16

Department repeated in boldface type that Father had been arrested for DUI in April 2018, which the Department relied on as evidence that Father continued to struggle with his sobriety and was not forthcoming, because he failed to disclose the arrest to the Department. The Department argued that Father had a pattern of failing to comply with the court's orders not to have contact with Grace, continuing to drink alcohol, and continuing to drive on a suspended driver's license. His DUI arrests during active case plans and continued disregard for the law showed Father had not gained sufficient insight from counseling sessions and had not adequately addressed the problems that led to removal of the children. His actions presented a danger to the children's physical and emotional health and safety.

At the Department's request and without objection by Father, the juvenile court continued the section 388 and 366.26 hearings multiple times, first to October 2019, then to December 2019, and then again to March 2020.

In November 2019, Mother and Father began driving to Arizona every other weekend for unsupervised visitation with J.N., N.F., and Jo.N. Father started using marijuana edibles for pain relief in December 2019. In December 2019, the juvenile court gave the Department discretion to expand visitation to include overnight, extended visits.

On January 26, 2020, Mother and Father had another son, Josue, who is not a subject of this appeal.

On February 11, 2020, Father tested positive for marijuana. As a result, Josue was declared a dependent and remained in the parents' custody under a family maintenance plan. On March 9, 2020, Father submitted a drug test that was

diluted. He stopped using marijuana, which he considered to be a relapse from his sobriety.

In March 2020, the Department filed an additional response to Father's section 388 petition. Grandmother reported that Mother and Father did not call the children to speak on the telephone between monthly visits. The children did not ask for the parents or ask to speak with the parents. After the parents visited, the children's behavior regressed. Six-year-old J.N. expressed fear that someone would come and take him. He was upset that Mother gave birth to another baby, but was not taking care of him, N.F., and Jo.N. He told a social worker that he likes visiting with his parents, but prefers to continue living with Grandmother because she takes care of him and follows the rules. Four-year-old N.F. also said she was happy when the parents visited, but wanted to continue living with Grandmother. She did not want to live with the parents because they did not protect the children.

In the Department's assessment, the parents had not established a bonded relationship with J.N., N.F., and Jo.N. The parents were unable or unwilling to understand the children's developmental stages and needs despite having completed services on multiple occasions. During visits, the parents undermined the structure and stability that the children had established in the care of Grandmother. They did not model positive behaviors, provide any structure, and did not help the children with homework during visits.

In the opinion of the Department, Grandmother continued to be the most appropriate placement for J.N., N.F., and Jo.N. She was committed to caring for the children to adulthood. The Chickasaw Nation was not opposed to terminating parental

18

rights with respect to J.N., N.F., and Jo.N.  The Department recommended Father's section 388 petition be denied.

**March 2020 to January 2021 – Mother Files Another Section 388 Petition While Father's Section 388 Petition Remains Pending**

Due to the coronavirus pandemic, the section 388 and section 366.26 hearings were continued several times, from March 2020 to May 2020, and then ultimately to January 21, 2021.  Once the pandemic began, the parents had video calls with the children two to three times each week.

Between July 2020 and January 2021, Father had 22 negative drug tests and two tests that were excused because he was verified to have been out of town.

On December 31, 2020, Mother filed a section 388 petition seeking custody of J.N., N.F., and Jo.N.

The Department reported that Mother and Father traveled to Arizona at least two weekends each month for visitation with the children.  Mother had been contacting Grace two to three times weekly.  The Chickasaw Nation continued to support the plan of adoption by Grandmother.

J.N.'s first-grade teacher wrote a letter recommending J.N. remain with Grandmother.  J.N. had been in her first grade class the year before and not applied himself.  After many conversations with Grandmother about his work habits, they decided to keep him in first grade another year.  Grandmother worked with J.N. over the summer. When he returned, his academic performance was greatly improved.  Without

19

Grandmother's diligence, his teacher felt J.N. would be far behind.

Jo.N.'s preschool teacher wrote a letter stating that Jo.N.'s behavior changes after he visits with his parents. He is more aggressive, less focused, and requires more redirection than usual. He is more likely to hit, push, or choke a friend. The teacher stated that it takes Grandmother and the school staff a couple of days to bring his behavior back in line.

Grandmother had an approved preliminary relative home study through the Arizona Department of Child Safety, but under Arizona's guidelines, an adoption ICPC could not be initiated until parental rights had been terminated. In a report that contained multiple incorrect statements of fact, the Department stated no history of child abuse or neglect had been noted as to Grandmother. The report did not explain the prior reports that there were substantiated allegations of child neglect as to Grandmother.

**Hearings on Parents' Section 388 Petitions**

The hearing on the parents' section 388 petitions took place on January 21, February 23, and March 15 and 17, 2021. The court stated that the section 366.26 proceedings would depend on the outcome of the section 388 petitions. After admitting evidence, including the Department's reports and letters documenting counseling sessions, the court heard testimony from Grandmother, Mother, and Father.

Grandmother testified that after parental visits, J.N. starts hitting and acting violently towards his siblings. He yells, without knowing why he is angry. Days later, he returns to

20

normal and is a loving brother to the siblings. The children did not want to talk to the parents on the phone and would reject their calls because they did not want to talk to them. The children's therapist said it would benefit the children if the parents did not have contact with them, because the parents do not require the children to follow rules on visits, resulting in the children having behavioral and anger issues. The children think they can continue with these behaviors when they come home and at school, both during and after the parents' visits. Grandmother cancelled the parents' last visit because N.F. had a rash caused by stress, and she had refused to reschedule visitation in order to prevent exposure to contagions.

Mother testified about classes, programs, and counseling that she completed. She attended domestic violence counseling and finished a course of couples therapy with Father in 2019. Mother participated in individual and couples therapy to learn to communicate effectively and appropriately, to strengthen their relationship, and to work as a team. No incidents of domestic violence had taken place in the past year. Mother described communication techniques that they learned and employed, and she described appropriate discipline and parenting techniques. The Department had been visiting their home monthly in connection with Josue and had no concerns.

Mother testified about Father's sobriety. Mother, Father, and Josue were living in the home of Father's grandparents, along with Father's older son from his prior relationship and Father's uncle. Family members in the home used some alcohol, but she did not consider the presence of alcohol to be a temptation for Father in light of his disinterest and his strong commitment to sobriety. She admitted that his use of marijuana

21

was a relapse, but she believed he had used marijuana for pain management, not recreation, and had stopped using it after receiving a positive drug test. If Father relapsed, however, Mother stated she would have to move out with the children.

Mother and Father drove to Arizona for unmonitored visits with J.N., N.F., and Jo.N. twice a month, for a total of four days each month. They provided food and engaged in activities with the children. On rare occasions, when the children exhibited aggressive behavior during visits, she called Grandmother to communicate about the children's behavior so the adults would have the same information. Previously, when they did not communicate directly, the children told the adults different things. Mother and Father employ timeouts for behavior issues on visits. Mother had not spoken with any of the children's teachers.

Mother expressed sorrow and regret that she had not been able to change sooner. Visiting the children from a distance and not being able to tell them when they could come home forced the parents to change their perspective. She explained that she had to unlearn patterns of domestic violence and physical abuse that she grew up believing to be normal family dynamics. There had been numerous visits when the children were upset and did not want to go back to Grandmother's home after visiting with the parents. Father's relationship with Grandmother was inconsistent. At times, Father and Grandmother did not speak to each other until they had cooled down. Father and Grandmother were not really communicating at the time of the hearings.

Father admitted past alcohol and anger issues. He had completed a domestic violence program. He quit drinking alcohol on January 5, 2017, and talks to his sponsor several times each

week. He used marijuana in December 2019 for pain, but he considers marijuana use to be a relapse and he stopped. Over the course of the dependency case, he completed several substance abuse treatment programs. Some were less successful because the people in the program were there by court order and not committed to recovery. The best program was at Twin Town in Torrance, where he found his sponsor, because the people participating in the program were committed to being sober. He completed the most recent program in August 2020.

The family members he lived with supported his sobriety. His grandfather kept a few bottles of beer in the refrigerator and his uncle had some plastic bottles of alcoholic drinks in his room. Father was aware that the children looked to Mother and Father as role models, so when the parents displayed destructive behavior, the children viewed it as a normal environment. Father's older children had seen him drinking when they were younger and they know that he is sober now. His older children have been able to see the changes in Father's and Mother's behavior and they appreciate the difference.

He currently has a valid driver's license. Father and Mother were taking classes in cosmetology school together. Father had been successfully parenting the children during visits in Arizona, so he believed he could continue to do so if they were returned to parental custody. He acknowledged that the longest period of time the children had lived in one place was their placement with Grandmother for the past two years. Father gets along well enough with Grandmother, although they had disagreements about visitation in the past month. He was aware that she loves the grandchildren and was doing everything she could for them. Unless she asked, he had not done much to

support Grandmother in raising his children. He had helped her with drywall and electrical issues in her home. He spent his funds for travel and visitation. He is concerned that Grandmother will decide it is too disruptive to the children's lives and their behavior to visit with their parents.

The parents' attorneys each argued it was in the children's best interest not to terminate parental rights and to order the children's return to the parents or to reinstate family reunification services. Father's attorney emphasized that Father had filed his section 388 petition in April 2019, nearly two years prior to the hearings.

The attorney for the children also asked the juvenile court to reinstate family reunification services and order overnight visits. The children's attorney explained that although it was difficult to recommend reinstatement of reunification services in light of the amount of time that the case had been open, after hearing the parents' testimony, the attorney believed there was a showing of significantly changed circumstances. The parents had addressed every issue that had brought the family before the court. The biggest safety concern was domestic violence, but the parents had taken responsibility and were able to articulate how they addressed the issue through counseling. Father's desire to demonstrate a different pattern for his children was exactly the type of self-reflection and insight that the dependency system intended parents to gain. Although the children's attorney had concerns about Father's alcohol abuse, Father had taken steps to address it. The attorney added, "Children are returned to parents all the time and cases close all the time without us knowing for sure that there won't be a relapse in the future." The children's attorney argued that although there was a risk of

relapse, Father had developed the tools and the support system to take the necessary steps to get back on track. The attorney felt Mother would benefit from Al-Anon if the court ordered reunification.

Although the Department had identified concerns about the children's behaviors following the parents' visits, the children's attorney noted that the observations were presented entirely by Grandmother and not based on the Department's observations. Grandmother wanted to provide permanency for the children, which was straining the family dynamic. It was not uncommon for children to act out following parent visits, often as a result of not wanting the visits to end.

The children's attorney discussed whether it would be in the children's best interests to reunify. On one hand, after seven years and five years respectively, J.N. and N.F. deserved a permanent resolution. The children had bounced around in foster care for many years and had been with Grandmother for almost two years. Ultimately, however, the attorney concluded the children deserved to be raised by parents who would put their safety first, had developed the tools for protective capacity, and had been successfully raising a baby sibling for over a year. The children's attorney therefore asked that the section 388 petitions be granted in part by reinstating reunification services, ordering overnight visits, continuing parents' participation in their current programs, and having Mother participate in Al-Anon meetings. Reunification services, rather than an outright return of the children, would provide for a transition period for the children and ensure that the parents could continue implementing the tools that they had developed with the added parenting responsibilities.

Without distinguishing among the children or acknowledging the children's different histories, the Department stated it had been almost nine years since the family first appeared before the juvenile court and the evidence of the parents' compliance was the same as the court heard when it returned the children previously. There were no different programs or classes. They were in the same therapy. There were no changed circumstances. The Department acknowledged that the parents' testimony was credible, but argued the facts were the same as had been presented in reports and certificates of completion for the past nine years. The Department asked the court to deny the petitions, arguing it was not in the children's best interest to delay permanency. Without acknowledging that it was responsible for delay, the Department noted the permanency hearing had been in limbo for the entire time that the children were placed with Grandmother. The Department argued it was not in the best interest of the children to remove them from the home that was meeting their needs to possibly transition back to the care of parents they have not lived with for two years. The Chickasaw Nation was in agreement with the Department, based on the information learned from the Department and from speaking with Grandmother monthly.

The juvenile court stated, "I have to tell you I'm not ready to return these children home today. I'm just not. The court's just not because the fear of failure is so great. [¶] Have the parents done everything I can possibly ask them to do? Yes. Seven years ago, five years ago, the case would have been return, case closed, and not come back. But that's not what happened . . . [¶] There's a lot of denial; a lot of going back and forth; a lot of, oops, I'm sorry, trying all over again. The court is encouraged

that there has been a child in their care for a year that hasn't been detained. [¶] But you're asking me after seven years and five years to send children home who haven't lived in this home for seven and five years. The court's not willing to do that today. . . . The court's intrigued that the Tribe in this case is agreeing with the Department and minors' counsel is not. I take that seriously." The court suggested that the best result for the children would be for Mother, Father, and Grandmother to sit down and figure out how to raise the children together.

"The court finds there's a substantial [change] of circumstances, but it's not in the best interest to send these children home today, and to extend reunification services, I think is cruel to these children that have been waiting seven and five years. [¶] So I'm going to deny the 388. It's time." The court conferenced with the attorneys about the section 366.26 hearing off the record.

On the record, the court spoke to the parents, "I know you're disappointed. I'm not terminating your parental rights today. I may never terminate your parental rights if you do the things I'm asking you to do. . . . First thing I'm going to do is I'm going to reinstate your weekend overnight visits because . . . ¶ I stated off the record I have parents who can't go across the street to visit or down the street and you guys are going out of state." The court set a date in April 2021, for the section 366.26 hearing.

The court noted for the record that Mother was crying and stated to the parents, "Who you are today took a long time to get to. Who dad is today took a long time to get to. Before I send babies home, I want to make sure there are no issues or problems. . . . [¶] The Department doesn't want me to do this. They want me to terminate your parental rights and move on. I

27

don't think that's in the best interest of your babies either. But you all have to find a way to get along with Grandma. I'm hoping during this time, when everyone figures out what it's going to look like for these children for the foreseeable future, things will calm down enough to see what's best for these children."

"Do we understand each other, Mom and Dad? I have to tell you that I am very impressed that you travel out of state to see your babies and that you spend time and the time that you talk about, when you're with them, as being a parent – not a friend, not a big sister, not an aunt, not a cousin. [¶] So I would find it very difficult to terminate parental rights at this point where we are today based on what I heard because this court believes Mom and Dad are now finally Mom and Dad or have a parental relationship. I believe the exception would apply." The court instructed the parents not to do anything before the section 366.26 hearing to change that. The court added, "Mother and Father, you have an absolute right to take me up on a rehearing or appeal of the denial of the 388. You have a limited number of days to file a rehearing and/or an appeal on this denial. [¶] Please speak to your attorneys forthwith, but listen to what I have to say. Not today but that doesn't mean it may not be tomorrow. Do we understand each other?" The parents acknowledged that they understood. The court denied the section 388 petitions and ordered overnight visits begin with Mother and Father.

Father and Mother each filed timely notices of appeal from the order denying their section 388 petitions. Section 366.26 permanency planning hearings were held on June 28 and July

28

22, 2021.[3]  The juvenile court ordered legal guardianship of J.N., N.F., and Jo.N. to Grandmother, finding that parents had shown the parental beneficial relationship exception applied.  A permanency planning review hearing scheduled for January 19, 2022, was continued to July 26, 2022.

## DISCUSSION

### Applicable Law and Standard of Review

"Section 388 allows a parent to petition to change, modify, or set aside any previous juvenile court order.  (§ 388, subd. (a).)  'The petitioner has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances *and* (2) that the proposed modification would be in the best interests of the child.'  (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.)  '[T]he change in circumstances must be substantial.'  (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223; see also *In re Mickel O.*, *supra*, 197 Cal.App.4th at p. 615 [change must be genuine and "'of such significant nature that it requires a setting aside or modification of the challenged prior order'"].)"  (*In re J.M.* (2020) 50 Cal.App.5th 833, 845.)

"The section 388 modification procedure is an "'escape mechanism" when parents complete a reformation in the short, final period after the termination of reunification services but before the actual termination of parental rights.'  ([*In re*]

_____

[3] We granted Father's request to take judicial notice of the June 28, 2021 minute orders.  On the court's own motion, we take judicial notice of the minute orders dated July 22, 2021, and January 19, 2022.

29

*Kimberly F.*[ (1997)] 56 Cal.App.4th [519,] 528; see [*In re*] *Marilyn H.*[ (1993)] 5 Cal.4th [295,] 309 ['the Legislature has provided the procedure pursuant to section 388 to accommodate the possibility that circumstances may change after the reunification period that may justify a change in a prior reunification order'].) We review a juvenile court's denial of a section 388 petition for abuse of discretion, and review its factual findings for substantial evidence. (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.) We may disturb the exercise of the court's discretion only when the court has made an unreasonable or arbitrary determination. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318[.])" (*In re J.M.*, *supra*, 50 Cal.App.5th at pp. 845–846.)

## Substantial Change in Circumstances

It is undisputed that the parents demonstrated a substantial change in circumstances. "A parent establishes a substantial change of circumstances for purposes of section 388 by showing that, during the period between termination of reunification services and the permanency planning hearing, he or she has resolved the previously unresolved issues supporting juvenile court jurisdiction. (See *In re A.A.* (2012) 203 Cal.App.4th 597, 611–612 ['The change in circumstances' must be such that 'the problem that initially brought the child within the dependency system must be removed or ameliorated. [Citation.] The change in circumstances or new evidence must be of such significant nature that it requires a setting aside or modification of the challenged order.'].)" (*In re J.M.*, *supra*, 50 Cal.App.5th at p. 846.)

The dependency proceedings in this case were instituted based on inappropriate discipline of the children prior to January 2014, including striking them with a belt or a shoe. The parents completed parenting classes, and in seven years following the last incident, there was no evidence that Mother or Father used inappropriate discipline or corporal punishment to discipline their children. The parents addressed issues of domestic violence, which had culminated in a very serious incident on June 13, 2016, through domestic violence counseling, individual and couples counseling, and Father's anger management classes. No incidents of domestic violence were reported in four and a half years prior to the hearings. After January 2017, and prior to filing his section 388 petition in 2019, Father demonstrated increasing success in his struggle with substance abuse. Father established even greater success in the two years after his petition was filed, before it was heard by the court. The parents presented ample evidence that they had addressed the primary reasons for juvenile court jurisdiction, and this constituted a substantial change for the purposes of the parents' section 388 petitions.

**Best Interests of the Children**

Mother and Father contend that it would be in the best interests of the children to be returned to their parents' custody, or at least to reinstate reunification services, but we conclude that no abuse of discretion has been shown.

"In any custody determination, a primary consideration in determining the child's best interest is the goal of assuring stability and continuity. (*Burchard v. Garay* (1986) 42 Cal.3d

531, 538, and fn. 6.)  'When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role.  That need will often dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child.'  (*Ibid.,* fn. omitted; see also *In re Marriage of McGinnis* (1992) 7 Cal.App.4th 473, 478.)"  (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.)

"After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount.  Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' (*In re Marilyn H., supra,* 5 Cal.4th 295, 309), and in fact, there is a rebuttable presumption that continued foster care is in the best interest of the child.  (*Id.,* at p. 302.)  A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interest of the child."  (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.)

The "best interests" analysis requires more than a simple comparison of the household and upbringing offered by the natural parent and the caretaker, here Grandmother.  (*In re Kimberly F., supra,* 56 Cal.App.4th 519, 529.)  Other factors to consider include: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been."  (*Id.* at p. 532.)

"This determination was committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established. [Citations.]" (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 318.) "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' [Citations.]" (*Id.* at pp. 318–319.)

We find no abuse of discretion in this case. Although both parents had engaged in services to address a longstanding dynamic involving domestic violence and Father had shown a commitment to sobriety, these improvements must be considered in the greater context of a very lengthy dependency proceeding, where the court permitted parents to regain custody of the children several times, only to have the children detained again under new allegations. It is undeniable that both parents have made great fforts to rectify their past mistakes and to foster and maintain a loving connection with all three children despite the significant distance. However, over the course of the first four years of this dependency proceeding, father repeatedly violated no-contact orders entered for the children's protection. Although the parents had been under court supervision since August 2013, when the Department filed the first petition in this case, there was substantial evidence of significant domestic violence in 2016, as well as father's ongoing problems with alcohol. All of this led to J.N.'s second removal and N.F.'s first. By the time the court terminated reunification services in May 2018, J.N. had been removed from parental custody three separate times, N.F. was removed twice, and Jo.N. once. However, in contrast to the

33

revolving door of reunification services and removal that marked their earliest stages in life, it appears that J.N., N.F., and Jo.N. have found a level of stability with Grandmother that is in their best interests.  J.N.'s teacher reported a marked improvement in his academics, and recommended he remain with Grandmother. In March 2020, a full year before the court's decision, J.N. and N.F. stated a preference for continuing to live with Grandmother over returning to parents.  Father even agreed in his testimony that Grandmother loves J.N., N.F. and Jo.N. and was doing everything she could for them.  It was within the juvenile court's discretion to credit this evidence, find the children's best interests were better served remaining with Grandmother, and deny the parents' section 388 petitions.

## DISPOSITION

The March 17, 2021 orders denying Mother and Father's section 388 petitions are affirmed.

MOOR, J.

We concur:

RUBIN, P.J.

BAKER, J.

34